IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

DIANA J. BURGESS,

      Plaintiff,

v.                           CASE NO. 2:09-cv-01163

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  By standing order, this case was referred to this United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).

Plaintiff, Diana J. Burgess (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on February 14, 2008, alleging disability as of September 11, 2006, due to degenerative disc disease and strain of the lumbar spine with radiculopathy, chronic obstructive pulmonary disease ["COPD"], asthma, major depressive disorder, and post traumatic stress

disorder ["PTSD"].  (Tr. at 15, 104-06, 108-10, 134-41, 168-73, 175-79.)   The claims were denied initially and upon reconsideration.  (Tr. at 15, 54-58, 59-63, 66-68, 69-71.)   On November 12, 2008, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 72-77.)  The hearing was held on March 23, 2009 before the Honorable William R. Paxton. (Tr. at 81, 85, 24-47.)  By decision dated April 27, 2009, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 15-23.)   The ALJ's decision became the final decision of the Commissioner on August 25, 2009, when the Appeals Council denied Claimant's request for review.  (Tr. at 1-5.)  On October 22, 2009, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. §§ 404.1520, 416.920 (2002).  If an individual is found "not

2

disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2002). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to

perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 17.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of degenerative disc disease and strain of the lumbar spine with radiculopathy, COPD, asthma, major depressive disorder, and PTSD. (Tr. at 17.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 17-19.)  The ALJ then found that Claimant has a residual functional capacity for sedentary work, reduced by nonexertional limitations. (Tr. at 19-21.)  As a result, Claimant cannot return to her past relevant work. (Tr. at 21.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as pager, document preparer, and surveillance monitor which exist in significant numbers in the national economy. (Tr. at 22.)  On this basis, benefits were denied. (Tr. at 23.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.  In Blalock v. Richardson, substantial evidence was

4

defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

<u>Claimant's Background</u>

Claimant was 45 years old at the time of the administrative hearing. (Tr. at 28.) She is a high school and college graduate with an Associate Degree in Printing, and a Bachelor's Degree in Printing Management and Technology Management. (Tr. at 28-29.) In the past, she worked in Records Management for Work Force West Virginia, in management for Foodland, and as a mail clerk in a post office. (Tr. at 30-31, 43.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below.

Physical Evidence

On October 26, 2004, Claimant entered a physical therapy and rehabilitation program at Montgomery General Hospital ["MGH"] for neck and arm pain. (Tr. at 191-93.)  Claimant attended sessions on October 28, 2004, November 2, 2004 and November 3, 2004, but cancelled appointments or was a "no show" on November 4, 2004, November 9, 2004, November 15, 2004, November 16, 2004. (Tr. at 190-91.)  On November 29, 2004, the physical therapist (name illegible) recommended that Claimant be discharged from the program because "Pt [patient] failed to return to clinic." (Tr. at 189.)

On April 4, 2005, Claimant cancelled an appointment with the MGH Physical Therapy clinic.  (Tr. at 188.)  On April 7, 2005, Claimant was again evaluated for neck pain and physical therapy sessions were arranged for treatment.  (Tr. at 186-87.) On April 11, 2005 and April 12, 2005, Claimant attended physical therapy sessions. (Tr. at 185.)  On April 14, 2005, Claimant cancelled her appointment.  (Id.)  On April 19, 2005, April 21, 2005, and April 22, 2005, Claimant was a "no show" for her appointments.  (Id.)  On April 22, 2005, the physical therapist (name illegible) recommended that Claimant be discharged from the program for "non-compliance." (Tr. at 184.)

6

Records indicate Claimant was treated at Cabin Creek Health Center ["CCHC"] from January 30, 2006 to June 23, 2008. (Tr. at 195-282.) The records are form "Progress Notes" with handwritten notations. (Id.) The records indicate Claimant was treated on approximately forty-three (43) visits to the clinic for a variety of ailments including neck pain, back pain, lumbar strain, depression, bronchitis, sinusitis, ear pain, medication refills, hypertension, rash, and seasonal allergies. (Id.)

Several records from CCHC show concerns about Claimant's medication needs. On February 11, 2006, M. B. Shaalan, M.D. wrote: "She also expressed concerns about her Lortab, stated that it was not in her system because it was stolen from her...I explained to her again, that it is against the policy at CCHC to write her any more Lortab." (Tr. at 199-200, 271-72.) On February 13, 2007, he wrote: "Anxiety attacks. She is supposed to follow up with Betsy Kent. Explained to her that we will not be refilling her Klonopin until she does." (Tr. at 231, 257.) On February 18, 2008, Dr. Shaalan indicated: "Pt [patient] is requesting a medical letter that she can't work and she is disabled from work, also she complains of head cold, likes to get some medications...I advised Pt that I don't have enough to justify disability, she was tearful and very emotional and angry about not (being) able to get pain pills, and also about disability papers." (Tr. at 201-02, 269-70.)

On March 27, 2006, Dr. Shaalan diagnosed Claimant with a

7

"whiplash injury...Pt [patient] ran into bed rails and hit her rt [right] leg, her whole body jerked and she fell on the mattress. She had headache and neck pain afterwards...radiating down both shoulders and arms."  (Tr. at 240-41.)

On April 18, 2006, Dr. Shaalan noted: "Pt [patient] fell down on the 5th of April, twisted her back while she was at work, hurting her neck, low back, radiates to her right leg mainly...previous injury in Sept. 2004 due to repetitive lifting (cervical spondylitis)."  (Tr. at 236-37.)

On August 28, 2006, provider notes from CCHC indicate that regarding her lumbar strain, Claimant was "released to go back to work and will follow up with us as needed."  (Tr. at 251.)

On February 4, 2008, Dr. Shaalan evaluated Claimant's lumbar spine MRI without contrast.  He found:

> Overview demonstrates preserved lumbar spine vertebral body height alignment and bone marrow signal.  There has been interval progression of the central disc bulge at L5-S1 with associated annular fissure.  There is left exit foraminal narrowing at L4-5 due to a left lateral disc bulge and left facet hypertrophy.  The right exit is spared.  No new areas of disc material beyond its normal confines are demonstrated.

(Tr. at 194.)

On August 4, 2008, a State agency medical source provided a Consultative Examination Report.  (Tr. at 283-88.)  The evaluator, Abdul M. Mirza, M.D. stated:

> She says she has PTSD.  By that she means she had trauma molestation from the age of 4 until she was 13 by her brother.  She was seen by a therapist at Charleston

8

General a year ago.  She has seen a psychiatrist, Dr. Lorene Monday, and has been on Lamictal 150 mg once a day of which she takes half in the morning and half in the evening since 2007.  She has symptoms of anxiety, depression, low self-esteem, low confidence, lack of interest...Her father was an alcoholic and abusive, and she has experienced domestic violence.  Her husband was violent and beat up on her, all according to the patient.  Then she had the stress of a job.  She says she was "blackballed" and fired after three years of work...She has pain all over...She has a history of bipolar disorder diagnosed a year ago.  Dr. Monday placed her on Lamictal and she said it helps...

IMPRESSIONS:
1.  Pain in the neck and was told she had degenerative disk disease.
2.  Pain in the back and was told she had degenerative disk disease.
3.  PTSD, detailed above.
4.  Bipolar disorder, diagnosed a year ago.
5.  History of hypertension.
6.  Patient says she is paranoid.  She thinks everyone is out to hurt her.

(Tr. at 284-86.)

On August 11, 2008, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform light work with the exertional ability to occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk and sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, and to have unlimited push and/or pull abilities. (Tr. at 304.)  Claimant was found to be able to occasionally perform all postural activities.  (Tr. at 305.) Claimant was determined to have no manipulative, visual, or communicative limitations.  (Tr. at 306-07.)  Claimant's only environmental limitations were to avoid concentrated exposure to

extreme cold, vibration, fumes, odors, dusts, gases, poor
ventilation, etc.  The evaluator, Rogelio Lim, M.D. noted:

> Allegations not fully credible.  Neck and low back pain
> but no objective findings of radiculopathy and neuro
> intact.  MRI revealed bulging disc L5-S1.  Alleges COPD
> [Chronic Obstructive Pulmonary Disease] but no
> documentation of severe exacerbation to require
> hospitalization. RFC [Residual Functional Capacity] made
> on the basis of medical evidence and its impact on ADL
> [Activities of Daily Living].  HPN [Hypertension] but BP
> [Blood Pressure] normal and no end organ damages.  PTSD.

(Tr. at 310.)

On September 4, 2008, Claimant was evaluated by Hatem M.
Hossino, M.D. at the request of Melissa Gamponia, M.D. regarding
Claimant's abdominal pain. (Tr. at 323.)  Dr. Hossino advised
Claimant to have laparoscopic cholecystectomy.  (Id.)

On September 17, 2008, Dr. Hossino reported that Claimant had
a laparoscopic cholecystectomy and "tolerated the procedure well."
(Tr. at 325.)

On September 25, 2008, Dr. Hossino reported:  "She said she's
still having some pain.  She's given a prescription for Lortab,
#20, and no refills...Her surgical wounds look good."  (Id.)

On September 29, 2008, a State agency medical source completed
a case analysis of the August 11, 2008 Physical Residual Functional
Capacity Assessment.  (Tr. at 311.)  The evaluator, Rabah
Boukhemis, M.D. reviewed all the evidence in the file and affirmed
the August 11, 2008 findings as written: "No new evidence or
allegations.  Clmt [Claimant] with DDD [Degenerative Disc Disease]

back mild, no neuro deficit.  Neck pain, possibly DJD [Degenerative Joint Disease].”  (Id.)

On September 30, 2008, Melissa J. Gamponia, M.D., evaluated Claimant at CCHC.  Dr. Gamponia noted that Claimant “just had gallbladder surgery 9/17/08 - went OK...Incision site hurt - noticed pus draining from the lower incision... Prescription written for Doxycycline 100 mg.”  (Tr. at 315-16.)

On October 23, 2008, Dr. Hossino stated: “The patient has been having abdominal pain...The surgical wound looks good.  She is advised to have gastroscopy since she continues to have symptoms.  She’ll be scheduled for the gastroscopy soon.”  (Tr. at 323.)

On October 31, 2008, Dr. Hossino reported that Claimant underwent a gastroscopy at St. Francis Hospital: “Patient has inflammation and also has a small hiatal hernia...The patient tolerated the procedure well.”  (Tr. at 324.)

On November 13, 2008, Dr. Hossino noted Claimant had missed her appointment.  (Id.)

Psychiatric Evidence

On May 30, 2006, “provider’s notes” from CCHC state: “[w]e did discuss the fact that she has not been taking her Zoloft, and she states, “yes”, she has been taking her Zoloft, that her mother has been giving it to her.  Told her, her insurance would not authorize for us to give her Zoloft, that we still have to try something else, so we wrote her a prescription for Prozac.  She is not really

11

having any additional problems at this time." (Tr. at 255.)

On August 28, 2006, "provider's notes" from CCHC state: "Depression. She continues to take Prozac. States that she just has had [it] with all of this that has gone one with her job and this Workers' Comp claim. She is just at the end of her rope. She was again encouraged to seek therapy, which she did refuse." (Tr. at 251.)

On September 7, 2006, Dr. Shaalan stated: "Last Tuesday, while she was at work, she was arguing with a supervisor, and then was smoking a cigarette when she lost her consciousness and she is not sure whether she had a seizure or panic attack...Pt is reassured that most likely what happened was hyperventilation." (Tr. at 218-19, 249-50.)

On October 17, 2006, "provider's notes" from CCHC indicate that Claimant

> is here today for refills on her medications. She notes she is doing well on the Lexapro...She does feel she needs some counseling or therapy, as she is under a lot of stress. She has been fired from her job...She needs a refill on her Zanaflex and hydrocodone...we are going to add BuSpar for anxiety...She will follow up with counseling this Friday.

(Tr. at 247.)

On October 23, 2006, Elizabeth J. Kent, MSW, LICSW, a behavior health consultant at CCHC, provided an initial assessment of Claimant. (Tr. at 223-24.) Claimant was referred due to "anxiety" and "depressed." (Id.) She stated:

12

Client's presentation: Very talkative, enumerates all details of recent events with conflict and subsequent firing from her job in records management with the state. Tone is aggrieved. Wrings hands. Sits very close, hugs me when she leaves. Reports PTSD from childhood abuse, alcoholic family. Mother of 13 year old. Reports death of father, grandfather, and ex-husband (murdered) as traumatic in addition. Rocks (sic) which helps her cope, reports displays of strong emotion (distraught crying), to the point of passing out due to a panic attack. Abusive former marriage as well. Strengths: receives and offers support from/to others, mother is main support, plays piano and writes music, devout.

Previous Counseling?  Yes.  Where?  Hospitalized at behavioral medicine "years ago" then had counseling, doesn't remember name; evaluated recently in General ER by B Med.

Affect:  angry, suspicious, edgy

Presentation of self: active, toward aggressive

Thought: not fully evaluated

Orientation: x 4 person time place situation...

Homework: Practice belly breathing

Therapeutic focus of treatment: Assessment, listening

(Tr. at 224.)

On November 9, 2006, Ms. Kent stated that she taught Claimant "relaxation techniques.  Pt [patient] reports being unable to overcome anger toward superiors at work and is having violent thoughts toward them."  (Tr. at 222.)

On November 29, 2006, Ms. Kent stated that Claimant presented as a walk-in when she missed her appointment which had been scheduled earlier that day

[Claimant] didn't keep (said she was asleep)and later saw

13

provider [at CCHC] who said she was suspicious, socially
inappropriate, and distressed.  She was seen then on an
emergency basis (by Ms. Kent).  She was crying, intensely
focused on her upcoming court case and mistreatment and
said she was physically and emotionally exhausted.  She
appeared agitated, speech was rapid with intense affect.
Friend [attending appointment with Claimant] (stated that
Claimant had an) extreme "panic attack" two days and two
yesterday - unresponsive, hands curled in, choked,
appeared to friend to be seizure.  Assess situation,
support, confront misperceptions, appeared calm at end of
session.  Will stay with friend until Monday and rest and
take care of herself, will eat.  Consider hospitalization
if persists.

(Tr. at 219.)

On November 30, 2006, Ms. Kent stated: "Patient continues [to

be] agitated, court case initial on December 4th...found out man who

murdered her ex-husband, daughter's father (his own brother) got

life without parole.  See in one week."  (Tr. at 220.)  "Provider's

Notes" from CCHC dated November 30, 2006, state:

In reviewing her medications, we found that she is taking
multiple medications that may be making her much more
emotional and clouding some of her judgment, and also
making her very tired.  I reviewed her medication list
with her and her friend.  I also expressed my concern to
her regarding her emotional health...We are going to
increase her Lexapro to 20 mg.  We are going to stop the
BuSpar, stop the Valium.  We are going to put her on
Klonopin 0.5 one p.o. t.i.d.., p.r.n.  She will continue
on the Neurontin.  I also discussed at length with her
friend my concern about Ms. Burgess staying alone.  Diana
does deny any sort of suicidal or homicidal ideations;
however, her friend will stay with her, and monitor her
medications, as I did express my concern to Diana that I
am not sure she is taking these medications as ordered
related to her emotional status and her fatigue.

(Tr. at 261.)

On January 4, 2007, Ms. Kent wrote: "Previous dx [diagnosis]

14

of PTSD, recently exacerbated by events at her former work...Sister thinks she is bipolar...Next session: screen for bipolar." (Tr. at 229.)

On February 9, 2007, Ms. Kent wrote: "Claimant asks to see me briefly... Some new hope about her human rights case.  Got medical card, has not made psychiatric appointment yet but intends to." (Tr. at 232.)

On February 13, 2007, "provider's notes" from CCHC state: "Anxiety attacks.  She is supposed to follow up with Betsy Kent. Explained to her that we will not be refilling her Klonopin until she does." (Tr. at 231, 257.)

On March 19, 2007, Ms. Kent wrote that Claimant "talks very fast, very angry about abuse by her employer.  Upset by referral to a psychiatrist, did not follow through...Very upset recently crying and splashing water on herself for 2 hours because her lawyer quit her case (thinks "bought off").  Asks about disability...(not having to work)." (Tr. at 233.)

On February 26, 2007, Ms. Kent wrote that Claimant was "calmer than when seen previously, still very hurt, emotionally focused on injustice at her job...She has been fired from her job." (Tr. at 214-15.)  Claimant was referred for an assessment for bipolar and post traumatic stress disorder ["PTSD"], and prescribed Lexapro, Klonepin, Lidoderm, Zanaflex, hydrocodone, Lortab, BuSpar. (Id.)

On July 11, 2007, Ms. Kent wrote that she had "talked with

Process Strategies...She found no record that Diana had been referred in the past. Diana needs to call...and confirm this appointment and provide her Medical Card number." (Tr. at 211.)

On July 24, 2007, Claimant underwent a Comprehensive Psychiatric Evaluation at Process Strategies by Louann Munday, APRN, BC-FNP, BC-ADM. (Tr. at 360-63.) Ms. Munday stated:

> Diana Joyce "D.J."...is here for depression. She was referred by Debbie Bostic and her therapist Betsy Kent...D. J. states that she was blackballed by the state government. She exposed them and went to the governor and now they are making sure she can't get a job in the state...She states she has panic attacks but what she describes doesn't sound like a panic attack. It sounded more like she has seizures...She was inpatient at B-Med in 1986 for two weeks. She said "I had a nervous breakdown." She overdosed at work and took all her meds she was taking for psychiatric help. She is not seeing Betsy for therapy only and has been seeing her since September or October 2006...Her brother sexually molested and raped her from the ages of 4-16. She said her mother knew about this but didn't do anything. She was physically abused by her father and brother. She was emotionally abused. She was neglected...
>
> MENTAL STATUS EXAMINATION:
> On exam today, the client was noted to be a normally developed Caucasian American female. She was appropriately dressed and groomed. She was cooperative. Speech was pressured in rate and elevated in volume. No motor abnormalities. Mood appeared to be dysphoric. Affect was broad. She denied suicidal or homicidal ideation. Thought process and content within normal limits. No hallucinations, delusions or illusions. No paranoia. Cognitively she was alert. She was oriented to person, place, and time. Memory for immediate, recent, and remote events intact. Intelligence appeared to be in the average range. Insight and judgment good per standard tests.
>
> DIAGNOSES:
> Axis I     Major Depressive Disorder, Provisional. 296.32
>            Anger Issues

16

```
                    R/O Bipolar Disorder
                    Post Traumatic Stress Disorder.  309.81
        Axis II     Deferred
        Axis III    Chronic pain in neck
        Axis IV     Psychosocial stressors: 09
        Axis V      Current GAF: 69
(Tr. at 360-62.)
```

Claimant had treatment and medication management at Process Strategies on August 21, 2007, September 24, 2007, October 22, 2007, November 19, 2007, March 3, 2008, March 31, 2008, May 13, 2008, August 5, 2008, September 2, 2008, September 30,2008, and December 29, 2008.  (Tr. at 335-59.)

On February 18, 2008, Michelle A. LeGault, LICSW, Process Strategies, wrote to Debra Thaxton, Case Worker, Department of Health and Human Resources:

> I am treating Diana Burgess for Mental Disorders since 8/14/07; also LuAnn Monday, APRM BC-FNP has seen her since 7/24/07.  She has a diagnosis of Post Traumatic Stress Disorder, a Bipolar II Disorder, depressed; R/O Bipolar Disorder of another type; R/O Major Depressive Disorder.  She has been compliant with medications but, clearly, is not yet stabilized on these medications as she is experiencing decreased sleep, low energy, anger, depression at a severe level, and anxiety at a severe level - sometimes with panic attacks.  She is having trouble organizing her thinking to stay focused on one thought for a while and wanting to return to preservative thinking about what has occurred in her workplace and continues to occur since being suspended from the Workforce Program on 9/6/07.  Many, if not all of her problems, stem from that date.  Right now she is unable to concentrate, interact with people and, in addition of the above described symptoms, would not be able to work anywhere in a reliable, consistent manner at this time. Because she worked in the Workforce Program and it is a part of the State System she has experienced subsequent difficulties in obtaining services from what seems to be a hostile environment.  Therefore she has had significant barriers to participate in the WV Works Program.

17

(Tr. at 351.)

On August 9, 2008, a State agency medical source completed a Psychiatric Review Technique form. (Tr. at 289-302.) The evaluator, John Todd, Ph. D., found Claimant's affective disorder (Major Depressive Disorder ["MDD"]) and anxiety-related disorder impairment (Post Traumatic Stress Disorder ["PTSD"]) were not severe. (Tr. at 289, 292, 294.) He found Claimant had mild restriction of activities of daily living and difficulties in maintaining social functioning, no limitations/difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. at 299.) He stated that evidence does not establish the presence of the "C" criteria. (Tr. at 300.) Dr. Todd concluded:

> CLMT [claimant] is mostly credible w/ [with] psych
> [psychiatric] diag [diagnosis] and OP [outpatient]
> TX/meds [therapy/medications]. TS [treating specialist]
> noted "doing well on meds" and no problems noted with MS
> from TS (5/13/08). Clmt related performing a wide range
> of daily activities independently w/o [without] problem
> though she relies on mother to write out bills. There is
> no evidence of significant limitations due to mental D/O
> and considered NON-SEVERE.

(Tr. at 301.)

On October 4, 2008, a State agency medical source completed a case analysis of the August 9, 2008 Psychiatric Review Technique form. (Tr. at 312.) The evaluator, Holly Cloonan, Ph.D. reviewed all the evidence in the file and affirmed the August 11, 2008 findings as written. (Id.)

18

On February 24, 2009, upon referral by Claimant's representative, John Atkinson, M.A., Licensed Psychologist, provided a Psychological Mental Status Examination Report. (Tr. at 364-76.) Mr. Atkinson noted:

> The patient reports feelings of harm towards others including her brother and her ex-husband, "I would kill him," also people she worked for. She states, "like to hurt them not kill them." It is noted she just told me she would kill her ex-husband. She has no plans to carry any of this out...

> The patient states she has been going to Process Strategies since '07, sees a nurse there, Louann Mundy, for medication and states she has never seen an actual psychiatrist or doctor at Process Strategies...It has been my impression that if a nurse or physician's assistant prescribes medication the patient must be seen by a physician regularly. She was diagnosed with "Bipolar II" and PTSD. It is noted the patient does not now and never has met the criteria for Bipolar Disorder and has never had a manic or hypomanic episode according to the DSM IV...

> The patient states she was beaten, assaulted and tormented by her father who also emotionally abused her...She states she was sexually molested beginning at age four by a brother who was actually only two years older age six and that went on for thirteen years...I don't believe it is possible for a child to come out normal growing up in a situation like that...The patient feels that people are after her and in fact are trying to kill her...

> SUMMARY AND CONCLUSIONS:

> In summary, we see here a forty-five year old female who came from a very pathological family and highly deviant early childhood but despite that attempted to have friends in school, was in clubs, had education after school, work and attempted to lead a normal life. However, on her last job the patient began to have emergence of frank paranoia with persecutory delusions and this has proceeded on to a paranoid psychotic illness. I'm not sure that her mental health center is

even aware of this from what the patient tells me and
from their case notes.  It is noted she has been given
medication for bipolar disorder which she does not have
and never did which further complicates the picture.  It
is felt by me that actually hospitalization in a facility
where she could be thoroughly diagnosed and appropriately
treated would be of benefit but she does not meet the
criteria for involuntary hospitalization at this time.
She is neither an active or a passive danger presently.
It may be easily seen that an individual who is this
disturbed and whose decompensation was related to work
environments cannot be expected to obtain, sustain and
function at any employment for the foreseeable future.

```
DIAGNOSIS:
AXIS I    296.34    Major       Depressive Disorder,
                    Recurrent, Severe with Psychotic
                    Features (Delusional Disorder)
          R/O       Schizo Affective Disorder, Depressed
                    Type with Paranoia
AXIS II             Obsessive Predisposition
AXIS III            No Diagnosis
AXIS IV             Legal Issues
AXIS V              GAF=45, Serious to Major Impairment
                    Current and Past Year.
```

CAPABILITY: If benefits are granted, the patient would be
able to manage her own financial affairs, including money
payments.

(Tr. at 366-72.)

On February 24, 2009, Mr. Atkinson also completed a form
titled "Mental Assessment of Ability to do Work-Related
Activities."  (Tr. at 373-76.) In the area titled "Making
Occupational Adjustments," he found that Claimant had "slight"
limitation following work rules and functioning independently;
"moderate" limitation dealing with the public and using judgement;
"marked" limitation relating to co-workers, interacting with
supervisors, and maintaining attention/concentration; "extreme"

20

limitations dealing with work stressors.  (Tr. at 374.)  In the area titled "Making Performance Adjustments," he found that Claimant had no limitations to understanding, remembering, and carrying out simple job instructions; "moderate" limitation to understanding, remembering and carrying out detailed, but not complex job instructions; and "marked" limitation to understanding, remembering and carrying out complex job instructions.  (Id.)  In the area titled "Making Personal Social Adjustments," he found Claimant had no limitations in maintaining personal appearance; "moderate" limitation in relating predictably in social situations; and "marked" limitations related to behaving in an emotionally stable manner and demonstrating reliability. (Tr. at 375.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ failed to develop the record and order an additional consultative examination; and (2) the ALJ failed to give proper weight to the opinion of Claimant's treating therapist. (Pl.'s Br. at 2-8.)

The Commissioner asserts that (1) the ALJ correctly determined that a second consultative examination was not warranted because the record was sufficiently developed to find that Claimant was not disabled under the act; and (2) the ALJ gave appropriate  weight to the treating therapist's opinion.  (Def.'s Br. at 7-14.)

21

Duty to Refer Claimant for a Consultative Examination

Claimant asserts that the ALJ erred when she failed to develop the record when she did not order an additional psychiatric consultative examination.  Specifically, Claimant argues:

> The ALJ stated that Mr. Atkinson's assessment was "neither supported by treatment records or the longitudinal history" (Transcript pg. 20).  He opined that although some of her mental health providers have mentioned some paranoia, there is no evidence that the paranoia has degraded to a state of psychosis (Transcript pg. 20).  The claimant's attorney asked the ALJ to order a consultative examination if he was not comfortable with Mr. Atkinson's evaluation (Hearing Tape).  The ALJ found that another one-time evaluation was not needed to complete the record...If the ALJ does not give the treating source nor the consultative examinations controlling weight, the ALJ has a duty to develop the issues.  The ALJ essentially eliminated all evidence of record, and therefore must develop new evidence.  There is clearly objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision (Transcript pgs. 283-288, 322-334, 335-363).  The ALJ failed in his duty to develop by not ordering a consultative examination.

(Pl.'s Br. at 4.)

The Commissioner responds that the ALJ correctly determined that an additional consultative examination was not needed because the treatment records from Process Strategies, covering a 17-month period of evaluation and treatment, provided ample evidence to support the ALJ's determination.  (Def.'s Br. at 9.)  Specifically, the Commissioner asserts:

> The ALJ correctly determined that an additional consultative examination...would serve no useful purpose.  None of the required criteria for a consultative examination...was met here.  Mr. Atkinson's conclusory opinion was not supported by the longitudinal treatment

22

notes, and an additional one-time examination would not change Plaintiff's longitudinal treatment history. Those treatment records, relied upon by the ALJ, were the most accurate picture of Plaintiff's condition. Plaintiff is simply incorrect when she asserts that the ALJ "essentially eliminated all evidence of record" and "must develop new evidence" (Pl.'s Br. at 4).

(Def.'s Br. at 11.)

The ALJ discussed Claimant's medical records, including the consultative mental status examination of February 24, 2009:

Progress notes from Cabin Creek Health Center (Cabin Creek), covering the period from January 2006 to June 2008, show routine health care for back pain and mood/anxiety problems. On November 30, 2006, she was "very emotional" and speaking with some paranoia, stating that she was also having a lot of back pain. On October 23, 2006, she complained of childhood abuse, an abusive marriage and was described as very talkative and aggrieved. On November 29, 2006, she was crying, and was intensely focused on her upcoming court case. She appeared agitated, speech was rapid and she complained of panic attacks. On January 8, 2007, she complained of back pain and felt that it was worsening, but was informed that the MRI was "really not that bad" to explain her alleged pain...

Mental health records show she underwent treatment at Process Strategies from July 24, 2007, to December 29, 2008 for major depression with anger issues, rule out bipolar disorder, and PTSD. These records show that initially claimant had trouble organizing her thoughts and complained of decreased sleep, low energy level, anger, severe depression and anxiety and occasional panic attacks. Nonetheless, while the initial examination revealed multiple subjective complaints, the mental status examination demonstrated normal thought process and content, broad affect, full orientation, intact memory, good insight and judgment and a Global Assessment of Functioning (GAF) of 69, which is compatible with mild restrictions. Despite regular medication management and treatment of 7 month duration, the same therapist disclosed on February 18, 2008 that the claimant was unable to work in a reliable and consistent manner. It is noted that the mental status examinations done through

December 2008, do not disclose findings to support this functional assessment, which has not been afforded substantial weight. They are for the most part essentially unremarkable with appropriate appearance, stable mood, appropriate affect, adequate sleep, informative content of thought, and full orientation (Exhibit 11F).

A one time mental status examination performed on February 24, 2009, at the request of the claimant's attorney disclosed an agitated and anxious mood, broad affect, paranoid ideation, and markedly impaired memory and concentration. The psychologist noted that interpersonal relationships are characterized by paranoia and suspicion and that her past neurotic behavior had decompensated into a paranoid psychosis. She was found to have extreme limitation in dealing with work stress, and marked limitation in relating to co-workers, maintaining attention and concentration, and behaving in an emotionally stable manner (Exhibit 12F).

The above assessment is neither supported by treatment records or the longitudinal history. It is noted that while some of her mental health providers have mentioned some paranoia towards her former employer, there is no evidence that this paranoia has degraded to a state of psychosis. All mental status examinations have been essentially unremarkable, and none of the mental health providers have mentioned the presence of markedly impaired concentration or memory. It is also pointed out that during an initial mental status examination performed in July 2007 she was found with a GAF of 69, which is not compatible with disability mental symptoms (Exhibit 11F). The February 2009 evaluation discloses a GAF score of 45, which is compatible with serious to major impairment of function, but this snapshot assessment appears to have been mostly dependent upon the claimant's self reported measures of anxiety and depression and does not adequately reflect her overall functional status. In addition to the activities of daily living previously mentioned, the claimant also admitted to the examiner that she goes bowling on Saturdays with her daughter and her friends' children, visits friends every day, and goes to visit her mother. Based on the foregoing, the ALJ has not afforded any substantial weight to the functional assessment of February 2009.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

In terms of the claimant's alleged symptoms, she testified that she takes multiple medications and suffers from back and mental symptoms, some of which she attributes to childhood emotional and sexual trauma. She asserts that she can only sit/stand for short periods, and walk no more than 20-30 feet. The claimant indicated that being around people makes her paranoid, but this claim is not supported by her acknowledged activities of daily living. She claims that she was terminated from her last job because there was a conspiracy against her. This testimony is not supported by the longitudinal history or the mental health treatment records and is not found entirely credible. There is a history of degenerative disc disease, but the condition has not warranted any surgery and has been treated conservatively with medication. The claimant presents normal motor strength, no muscular atrophy, and intact sensation and reflexes. She does not require any assistive devices to ambulate and her gait and stance have been described as normal.

As for the opinion evidence from the State agency physical and mental reviewing consultants, the undersigned funds that they are essentially supported by the medical evidence and are afforded substantial weight (Exhibits 5F and 6F).

The claimant's attorney moved that the undersigned obtain a consultative psychological evaluation. The undersigned concludes that another one-time evaluation is not needed to complete the record, in view of the treatment records and claimant's testimony discussed above.

(Tr. at 19-21.)

Regarding the ALJ's duty to refer a claimant for a consultative examination, 20 C.F.R. § 416.917 (2006) provides that

25

> [i]f your medical sources cannot or will not
> give us sufficient medical evidence about your
> impairment for us to determine whether you are
> disabled or blind, we may ask you to have one
> or more physical or mental examinations or
> tests.

In Cook v. Heckler, the Fourth Circuit noted that an ALJ has
a "responsibility to help develop the evidence." Cook v. Heckler,
783 F.2d 1168, 1173 (4th Cir. 1986). The court stated that "[t]his
circuit has held that the ALJ has a duty to explore all relevant
facts and inquire into the issues necessary for adequate
development of the record, and cannot rely on evidence submitted by
the claimant when that evidence is inadequate." Id. The court
explained that the ALJ's failure to ask further questions and to
demand the production of further evidence about the claimant's
arthritis claim, in order to determine if it met the requirements
in the listings of impairments, amounted to a neglect of his duty
to develop the evidence. Id.

Nevertheless, it is Claimant's responsibility to prove to the
Commissioner that he or she is disabled. 20 C.F.R. § 416.912(a)
(2006). Thus, Claimant is responsible for providing medical
evidence to the Commissioner showing that he or she has an
impairment. Id. § 416.912(c). In Bowen v. Yuckert, the Supreme
Court noted:

> The severity regulation does not change the
> settled allocation of burdens of proof in
> disability proceedings. It is true . . . that
> the Secretary bears the burden of proof at
> step five . . . [b]ut the Secretary is

26

> required to bear this burden only if the
> sequential evaluation process proceeds to the
> fifth step. The claimant first must bear the
> burden . . . of showing that . . . he has a
> medically severe impairment or combination of
> impairments . . . . If the process ends at
> step two, the burden of proof never shifts to
> the Secretary. . . . It is not unreasonable
> to require the claimant, who is in a better
> position to provide information about his own
> medical condition, to do so.

Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Although the ALJ has a duty to fully and fairly develop the record, he is not required to act as plaintiff's counsel. Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994). Claimant bears the burden of establishing a prima facie entitlement to benefits. See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C.A. § 423(d)(5)(A)("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.") Similarly, Claimant "bears the risk of non-persuasion." Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

The court proposes that the presiding District Judge find that the ALJ properly evaluated the claim and was not delinquent in any duty to refer a claimant for a consultative examination per 20 C.F.R. § 416.917 (2006). It is noted that the regulation provides that an ALJ "may" ask for a physical or mental examination if there is not sufficient medical evidence about the impairment to determine whether a disability exists. Here, the ALJ did not err

in finding there was sufficient medical evidence to determine that Claimant was not under a disability as defined in the Social Security Act.   It is clear from the decision that the ALJ considered the entire record, including Claimant's testimony regarding her medical treatment, medications, and activities of daily living. (Tr. at 15-23.)

Thus, the court proposes that the presiding District Judge **FIND** that the ALJ did not err in failing to order an additional consultative examination.

Weight Given Opinion Evidence

Claimant further argues that the ALJ erred in failing to give adequate weight to the opinion of Claimant's treating therapist. Specifically, Claimant argues:

> The ALJ did not give the claimant's treating therapist substantial weight (Transcript pg. 20).  The ALJ opined, "despite regular medication management and treatment of 7 month duration, the same therapist disclosed on February 18, 2008, that the claimant was unable to work in a reliable and consistent manner" (Transcript pg. 20). However, the ALJ is incorrect in assuming that regular medication management and treatment for 7 months will, in all cases, be enough to medically improve.  Just because someone is in treatment and their medications are managed for 7 months does not mean that they can obtain or maintain employment.  In fact, just the opposite is true in the present case.  Despite months of treatment and medication management, the claimant's paranoia and depression worsened and developed into psychosis (Transcript pgs. 364-376)...
>
> [T]he ALJ did not reference the numerous mental status exams that were marked with inadequate sleep, inappropriate affect, moods, low energy, or poor appetite (Transcript pgs. 336, 342, 348, 355, 359).  Although the ALJ found that the exams were "for the most part

unremarkable," in fact half of the exams were remarkable for symptoms of the claimant's severe mental status. *Id.* The ALJ erred when he picked and chose which mental status exams to review when deciding how much weight to assign to the claimant's treating source...The ALJ erred in substantiating his dismissal of the claimant's treating sources's opinion by citing the one-time GAF of 69.

(Pl.'s Br. at 6-7.)

The Commissioner responds that the ALJ afforded appropriate weight to the treating physician's opinion. Specifically, the Commissioner asserts:

Although Plaintiff cites the appropriate regulation in her brief, she has completely mischaracterized the evidence and the ALJ's analysis of that evidence. Contrary to Plaintiff's assertion (Pl.'s Br. at 6), the ALJ did not base his decision on a theory that medication management alone will, in all cases, lead to improvement. Rather, the ALJ looked at the medication management over the 17-month period as one of the factors that led to the improvement that was documented in the record. The ALJ did not arbitrarily or unilaterally conclude that Plaintiff's condition had improved. Rather, the objective medical evidence, upon which he relied, led to this conclusion. The evidence showed that Plaintiff's impairment, while certainly not completely benign, would nevertheless not prevent her from performing the simple, routine, unskilled jobs identified by the VE (Tr. 44). Plaintiff is also incorrect in suggesting that the ALJ based his decision on one GAF score of 69 (Pl.'s Br. at 7). The ALJ merely cited that GAF as an additional reason for discrediting the conclusory opinion of psychologist Atkinson (Tr. 20-21)...

It is simply incorrect for Plaintiff to assert that the ALJ "picked and chose which mental status exams to review" (Pl.'s Br. at 7). The ALJ did nothing of the kind. Rather, he looked at the longitudinal picture of Plaintiff's treatment regimen and, in so doing, came to the reasonable conclusion that Plaintiff was capable of a reduced range of sedentary work...There was also ample support for the ALJ's rejection of the opinion of Ms. LeGault, the social worker...As such, she is not an

29

"acceptable medical source," as that term is defined in the regulations.

(Def.'s Br. at 12-14.)

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability.  See 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2006).  Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2006).  The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2006).  Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational.  Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion

30

should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2), 416.927(d)(2).

In the subject appeal, the opinion evidence in question [that Claimant "would not be able to work anywhere in a reliable, consistent manner at this time" (Tr. 20)] is from Claimant's treating therapist, Michelle A. LeGault, a licensed social worker with Process Strategies, and not a licensed physician or licensed psychologist. (Tr. at 351.)  As such, Ms. LeGault is not an "acceptable medical source" per the regulations.  20 C.F.R. §§ 404.1513(a), 416.913(a).

Per 20 C.F.R. § 416.913(d), an ALJ is permitted to consider evidence from "other sources" in addition to evidence from the acceptable medical sources listed in paragraph (a) of the section, in order to determine how a claimant's ability to work is affected. Therapists are listed as acceptable other sources.  20 C.F.R. §

31

416.913(d)(2).   However, it is noted that the ALJ did not reject Ms. LeGault's opinion on this basis but because her opinion was not supported by the objective treatment records.   20 C.F.R. §§ 404.1527 and 416.927(d)(3)-(4).

It is further noted that the ALJ considered and relied on the reports from Claimant's various therapists in concluding that Claimant's major depressive disorder ["MDD"] and post traumatic stress disorder ["PTSD"] were "severe" impairments, despite two State agency medical sources finding that Claimant's MDD and PTSD were *not* severe impairments.  (Tr. at 17.)  Additionally, the ALJ took those impairments into account when he limited Claimant to work involving only simple instructions, routine and repetitive tasks, and only occasional interaction with the public. (Tr. at 22-23, 44.)  Further, it is clear from the excerpt of the ALJ's opinion found on pages 23 through 25 of these proposed findings (Tr. at 19-21), that the ALJ did not "pick and choose which mental status exams to review" nor did the ALJ simply base his opinion on one GAF score of 69 as alleged by Claimant.  (Pl.'s Br. at 7.)

The court proposes that the presiding District Judge find that the ALJ properly evaluated the records from the treating therapists, which showed that Claimant had some limitations related to her mental impairments of MDD and PTSD but was capable of making a successful adjustment to other work that exists in significant numbers in the national economy.

32

Thus, the court proposes that the presiding District Judge **FIND** that the ALJ did not err in his consideration of Claimant's treating therapist's opinions.

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the presiding District Judge **AFFIRM** the final decision of the Commissioner and **DISMISS** this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., District Judge.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have ten days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th

Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Copenhaver, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

  December 2, 2010
      Date

Mary E. Stanley
United States Magistrate Judge

34